UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF PONTIAC
RETIRED EMPLOYEES, *et al.*,

       Plaintiffs,

v.                                      Case No. 12-12830
                                           Hon. Lawrence P. Zatkoff

CITY OF PONTIAC, *et al.*,

       Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 17, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order [dkt 2], which sought the issuance of a temporary restraining order and preliminary injunctive relief.  On July 2, 2012, the Court denied Plaintiffs' request for a temporary restraining order [dkt 10] and took their request for preliminary injunctive relief under advisement.  On July 10, 2012, a hearing was held on Plaintiffs' request for preliminary injunctive relief.  Both parties thoroughly briefed and argued the issue before the Court.  After considering the parties' argument and supporting papers, the Court DENIES Plaintiffs' request for preliminary injunctive relief for the reasons that follow.

## II. BACKGROUND

**A.  FACTUAL BACKGROUND**

This case arises out of changes made to the City of Pontiac's ("the City") municipal employee retirement plans, including plans providing health insurance coverage, from December 2011 through the present day. These changes are memorialized in a series of orders ("Orders") prepared by Defendant Louis Schimmel, who is the appointed Emergency Manager ("EM") for the City.  Plaintiffs seek to reinstate benefits to the level existing prior to the EM's changes and to prevent the payment of health insurance premiums by individual Plaintiffs (approximately 1000 retirees) to retain their present health care coverage.

### 1. The City's Benefit Plans

Chapter 92 of the City's Municipal Code of Ordinances ("Chapter 92") establishes a comprehensive regulatory framework for retiree benefits.  Chapter 92 establishes "the City of Pontiac General Employees Retiree Health and Insurance Benefits Plan and Trust," more commonly referred to as the Voluntary Employees Beneficiary Association ("VEBA"). VEBA provides health care and life insurance benefits to certain City retirees (and their eligible spouses and dependants) who are eligible to receive a retirement benefit from the City's General Employees Retirement System.

Most of the health and life insurance benefits provided to retirees are set forth in contracts incorporated into the VEBA benefits plan by ordinance. For union retirees, the insurance benefits are provided for in collective bargaining agreements ("CBAs") with the City. There are also some non-union retirees whose health benefits are set forth in separation agreements.

### 2. Public Act 4

The EM is appointed to oversee a city's financials based on the procedures set forth in Michigan's Emergency Manager Public Act 4 ("Act 4"), which became effective on March 16, 2011.  Under Act 4, the EM, once appointed, has authority to adopt or amend ordinances and

"exercise, solely, for and on behalf of the local government, all other authority and responsibilities of the Chief administrative office and governing body concerning the adoption and amendment and enforcement of ordinances or resolutions of the local government." Act 4 also enables the EM to cancel municipal debts, terminate existing municipal contracts, and temporarily modify CBAs under certain, limited circumstances.

### 3. The City's Finances

The City has been operating at a deficit for a number of years. For fiscal year ending June 30, 2008, the deficit was $7,007,957; for June 30, 2009 the deficit was $5,607,638; and June 30, 2010 the deficit was $4,089,199. For the year ending June 30, 2011, the City shows a surplus of $544,732, but only because it did not make certain contributions—totaling $11,210,690—to the general VEBA, Police and Fire VEBA, and Police and Fire Pension. For fiscal year ending June 30, 2012, an approximately $8 million deficit is expected.

The City asserts that income tax and property tax revenues continue to decline. In fiscal year 2008, the City received $54.2 million in revenue; twice the amount the City projects that it will receive in fiscal year 2013 ($29.9 million). For fiscal year ending June 2013, the City projects expenses will exceed revenue by $5.9 million.

Retiree healthcare is the City's single largest expense. The City will spend $13.5 million on medical and dental insurance coverage for the year ending June 30, 2013, of which only $1.2 million is for active employees. Cost sharing provisions implemented by the EM—wherein employees are required to contribute to the cost of their benefits—are projected to save the City $1.9 million in the fiscal year ending June 30, 2013.

On or around June 5, 2012, a proposed budget that resulted in a surplus for Fiscal Year 2012–2013 was presented at a public hearing where City officials discussed the City's budget

issues. The projected budget surplus stems in part from the sale of the city's wastewater treatment facility, which is to be transferred to Oakland County. The proceeds of this sale will be used to solve the immediate budget deficit, and it also addresses some "long-term" deficit issues, including outstanding municipal bonds. Despite the budget surplus created by the sale of the wastewater treatment facility, the EM forecasts that declining property taxes and unfunded liabilities continue to create a structural deficit.

### 4. Changes to Retiree Benefits

In response to the City's growing financial troubles, in December of 2011, the EM modified the terms of CBAs and shifted to retirees the costs of prescription drugs and other co-payments. A series of Orders issued by the EM from December of 2011 through the present list the various modifications that have or will take effect. These modifications include the following:

1. Effective June 25, all pre-Medicare retirees were forced to authorize the deduction of anywhere between $91 and $500 or more from their pension checks to pay premiums for their health insurance benefits. The deductions are set to begin July 1, 2012, but the actual funds will not be taken until the checks are issued on July 24, 2012. If retirees do not authorize deductions, they will lose all remaining coverage.

2. Effective July 1, the City will be allowed to modify all existing health insurance coverage for pre-65/non-medicare retirees, and may even switch their plans, carriers and plan designs. This is not a temporary measure, but an indefinite power the EM has reserved for future municipal officials. Consistent with these new powers, at least some retirees will have their medical and dental benefits transferred to different plans and carriers beginning July 1, 2012.

3. All life insurance, disability, vision and hearing coverage for all retirees was eliminated.

4. All retirees are required to enroll in Medicare, and all current retirees are required to use Medicare Advantage Plan G. Future retirees will be required to participate in Medicare Advantage at the discretion of the City.

5. The City discontinued any payments for any Medicare Part B premium under any plans.

6. The City made modifications to dental coverage resulting in higher costs for all retirees.

7. Co-payments for prescription drug coverage was increased for many or most retirees, union and non-union.

8. An annual deductible was increased to $750 per person, per year.

Using the authority granted by Act 4 to adopt or amend ordinances, on May 30, 2012, the EM repealed Chapter 92, which Plaintiffs relied on as establishing non-union retirees' rights to health insurance benefits.

**B. PROCEDURAL BACKGROUND**

Plaintiffs' filed their motion for a temporary restraining order seeking to: (1) enjoin Defendants from implementing proposed changes to Plaintiffs' health care benefits, including the requirement to pay premiums for retirees under the age of 65; and (2) ordering Defendants to reinstate health care coverage as provided to Plaintiff Medicare eligible retirees and Plaintiff pre-Medicare eligible retirees prior to the December 2011 Orders issued by the EM. After hearing oral argument on July 10, 2012, the Court now considers whether Plaintiff is entitled to preliminary injunctive relief.

### III. LEGAL STANDARD

A court is to consider the following four factors in determining whether a plaintiff is entitled to preliminary injunctive relief:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

    (3)    whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

    (4)    whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. MHSAA, Inc.*, 64 F.3d 1026, 1030 (6th Cir.1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

"A preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law." *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001). The moving party has the "burden of proving that the circumstances clearly demand [an injunction]." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## IV. ANALYSIS

**A. STATE LAW CLAIMS**

As an initial matter, the Court will briefly address the claims set forth in Plaintiffs' Complaint. The Complaint premises the Court's jurisdiction on a federal question containing the following Counts:

    Count I        Unconstitutional Impairment of Contract

    Count II       Violation of the Bankruptcy Clause of the Constitution

    Count III      Unconstitutional Deprivation of Property Without Due Process

    Count IV      Violation of Michigan Constitution Article I, § 24

    Count V       Breach of Contract

| | |
|---|---|
| Count VI | Violation of Mich. Comp. Laws § 38.1140h |
| Count VII | Violation of Mich. Comp. Laws § 38.1683 |
| Count VIII | Violation of Mich. Comp. Laws § 141.1519 |

Federal district courts have original subject-matter jurisdiction over cases arising under federal law. 28 U.S.C. § 1331. The Court has subject-matter jurisdiction over Counts I–III because they arise under federal law. 28 U.S.C. § 1331. Counts IV–VIII, however, appear to be based on state law. Although the Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367(a), the Court may decline to exercise supplemental jurisdiction if there are "compelling reasons for declining jurisdiction." *Id.* § 1367(c)(4).

The Court finds that Plaintiffs' state-law claims raise novel and complex issues of state law that would be more appropriately adjudicated by the state court. *See id*. § 1367(c)(1). Additionally, the contemporaneous presentation of Plaintiff's parallel state claims for relief will result in the undue confusion of the jury. *See* 28 U.S.C. § 1367(c)(4); *see also Padilla v. City of Saginaw*, 867 F. Supp. 1309, 1315 (E.D. Mich. 1994). As such, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims in this matter. The Court turns next to the merits of Plaintiffs' request for preliminary injunctive relief.

**B. LIKELIHOOD OF SUCCESS ON THE MERITS**

### 1. *Contracts Clause Claim Under 42 U.S.C. § 1983*

Plaintiffs first claim that the Contracts Clause bars the EM from modifying their health insurance benefits by Order. Defendants argue that, assuming the Contract Clause even is applicable,[1] it has not been violated by the EM's Orders. The Contract Clause provides that "No

---

[1] According to Defendants, Plaintiffs assert that the various CBAs submitted by them establish lifetime medical benefits to retirees. Defendants, however, challenge the effectiveness of these CBAs, pointing out that the last CBA attached was the 1999–2002 CBA between the City and the Pontiac Police Supervisors Association, which only applied from January 1, 1999, through December 31, 2002, and which could thereafter be terminated upon 60 days notice by either party. Defendants further claim that the other CBAs supplied by Plaintiffs each have similar express duration clauses. At this point, it is unclear from the parties' papers and oral argument whether a CBA was in effect

7

State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., art. 1, § 10. This prohibition is not absolute, *El Paso v. Simmons*, 379 U.S. 497, 508–09 (1965), and is qualified by the "measure of control which the State retains over remedial processes" and the State's continued "authority to safeguard the vital interests of its people." *Home Bldg. & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 428 (1934). "It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contacts already in effect'." *El Paso*, 379 U.S. at 509 (citing *Stephenson v. Minford*, 287 U.S. 251, 276 (1932)).

A claim under the Contracts Clause must rest on an exercise of legislative power, not actions of administrative or executive boards or officers. *Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011) (citing *New Orleans Waterworks Co. v. La. Sugar Ref. Co.,* 125 U.S. 18, 30 (1888) ("In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the state.")); *Kinney v. Conn. Judicial Dep't,* 974 F.2d 313, 314 (2d Cir.1992) (quoting *New Orleans Waterworks* and reiterating that violations of the Contract Clause arise from legislative action).

Here, it appears that Plaintiffs' claims are flawed at the outset. The only applicable law passed by the state was Act 4, yet Plaintiffs do not challenge Act 4. Rather, Plaintiffs' claims are based on the Orders issued by the EM, which purportedly violated the terms of various CBAs or separation agreements made with retirees.[2] The EM's actions, however, are not an exercise of

---

at the time of the EM's orders, or whether the EM properly terminated any applicable CBA upon giving proper notice of the changes to the retirees' benefits.

[2] Plaintiffs' also allege that at least some Plaintiffs were entitled to health care benefits based not on the CBAs, but on the "interplay" between Chapter 92 and the Michigan constitution. This claim, however, is not based on an express contract, does not fall within the purview of the Contracts Clause, and thus the Court need not reach this issue. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 187-88 (1992) (finding that, before a party can succeed on a Contracts Clause claim, a pre-existing contract must exist).

legislative power—the EM did not enact any laws, he merely acted pursuant to authority granted to him by Act 4 which, allegedly, impaired Plaintiffs' rights under the CBAs and separation agreements. Plaintiffs' attempt to impute fault on the EM for impairing contractual obligations "under color of law" pursuant to § 1983 is unpersuasive.

Recourse under § 1983 for the deprivation of rights secured by the Contracts Clause is limited to discrete instances where a state: (1) has denied a citizen the opportunity to seek adjudication through the courts as to whether a constitutional impairment of a contract has occurred, or (2) has foreclosed the imposition of an adequate remedy for an established impairment; § 1983 provides no basis to complain of an alleged impairment in the first instance. *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011). *See also, Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011) ("To establish a Contracts Clause claim, [plaintiff] must show more than a breach of the settlement agreements; it must show that the defendants have somehow impaired its ability to obtain a remedy for a demonstrated breach") (relying on *Crosby*'s notion that the Contracts Clause "provides no basis to complain of an alleged impairment in the first instance," but supports a claim "where a state . . . has foreclosed the imposition of an adequate remedy for an established impairment")).

According to the plain language of the Contracts Clause, Plaintiffs fail to challenge legislation passed by the State. Moreover, Plaintiffs have neither alleged that the state has denied them an opportunity to seek recourse through the courts, nor alleged that the state foreclosed the imposition of an adequate remedy for an established impairment. As such, at this point, Plaintiffs are unlikely to succeed on the merits of their Contracts Clause claim.

### 2. Bankruptcy Clause Claim

Plaintiffs also argue that the EM's orders amount to a de facto bankruptcy proceeding in violation of 11 U.S.C. § 903(1). Chapter 9 of the Bankruptcy Code "does not limit or impair the

9

power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but . . . a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition[.]"

According to Plaintiff's Motion:

> Because Chapter 9 of the Bankruptcy Code establishes a national, uniform system for adjusting municipal debts and explicitly prohibits state laws intended to reduce municipal debt obligations, *the application of Public Act 4 through the emergency manager orders at issue here is preempted by federal law.*

(emphasis added).

Notably, however, Plaintiffs set forth no legal authority supporting the contention that Act 4, or any similar state statute, is preempted by federal bankruptcy law. This case is not a bankruptcy case, and Plaintiffs' attempt to cast this case as a de facto bankruptcy is unpersuasive. As such, Plaintiffs are unlikely to succeed on the merits of their Bankruptcy Clause claim.

### 3. *Due Process Claims*

The Fourteenth Amendment prohibits state actors from depriving an individual of life, liberty or property without due process of law. U.S. Const. amend. XIV, § 1; *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532,538 n. 3 (1985). To establish a due process violation, a plaintiff must first establish the existence of a constitutionally protected property or liberty interest. *Silver v. Franklin Twp. Bd. of Zoning Appeals,* 966 F.2d 1031, 1036 (6th Cir.1992). Plaintiffs here do not claim a life or liberty interest in health care benefits; rather, their claim is predicated upon a "property interest" in such benefits. "Property interests are not created by the Constitution, but are created and defined by 'existing rules or understandings that stem from an independent source.'" *Sutton v. Cleveland Bd. of Ed.,* 958 F.2d 1339, 1348 (6th

Cir.1992) (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)).  To have a constitutionally cognizable property interest, a person must have more than an abstract need or desire for it; he must have more than a unilateral expectation of it; he must, instead, have a legitimate claim of entitlement to it.  *See Roth,* 408 U.S. at 577.

According to Plaintiffs, it is beyond dispute that the CBAs create a property interest in health benefits for the union retirees.  Plaintiffs, however, fail to support this contention with any authority, legal or otherwise.  With respect to the non-union retirees, Plaintiffs state that the interplay between the Michigan constitution and Chapter 92 of the Pontiac Code of Ordinances creates a legitimate claim of entitlement to health insurance benefits.  This claim, too, is supported by no legal authority, and appears to be based on state law.  Plaintiffs provide nothing to establish that a purported right, based on the alleged "interplay" between Chapter 92 and the Michigan constitution, is a constitutionally protected property interest.  Moreover, having reviewed the supplied provisions of several CBAs supplied by Plaintiff, there appears to be no provision that would forever entitle Plaintiffs to the exact same health care benefits that existed prior to the EM's Orders.

Notwithstanding this failure, even if Plaintiffs had demonstrated a constitutionally protected property interest, it is well-settled that, in order to state a procedural due process claim under § 1983, they must show that available state procedures were inadequate to compensate for the deprivation of their protected property interest.  *See Parratt v. Taylor,* 451 U.S. 527 (1981); *McMenemy v. City of Rochester,* 241 F.3d 279, 288–89 (2d Cir. 2001) (holding that, where a plaintiff fails to avail himself of contractual grievance procedures or other available state remedies (such as an administrative or state court action), he may not bring a federal claim of lack of due process); *Limerick v. Greenwald,* 749 F.2d 97, 99 (1st Cir. 1984) (finding that a claim of lack of due process fails on the merits where there is a process available under state

11

law); *Roslindale Coop. Bank v. Greenwald,* 638 F.2d 258, 261 (1st Cir. 1980), *cert. denied,* 454 U.S. 831 (1981) ("We cannot be sympathetic to a party who elects to forego the [state procedures] provided him, and then complains he received none . . . . Since a sufficiently timely hearing was available to them, [the plaintiffs] cannot bootstrap themselves into the federal court by failing to seek it.").

Here, there is no indication that Plaintiffs exhausted all state court remedies, including state administrative actions. Plaintiffs therefore cannot claim that they were denied procedural due process. As such, Plaintiffs are unlikely to succeed on the merits of their procedural due process claim.

### *4. Conclusion*

Because Plaintiffs appear unlikely to succeed on the merits of their three federal claims, this factor weighs strongly in favor of denying injunctive relief.

### C. IRREPARABLE INJURY

Plaintiffs argue that they will suffer irreparable injury in the reduction in coverage and increased cost of health care benefits. Defendants do not dispute that Plaintiffs' health benefits will be altered, but instead argue that such action is reasonable and necessary to confront the City's financial problems. Even if Plaintiffs have not established a strong probability of success on the merits, the Court may still issue a preliminary injunction if Plaintiffs have "'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n. 2 (6th Cir.1987) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102–05 (6th Cir. 1982). The Court acknowledges that the health benefits would be altered to the extent that there would be more out of pocket costs for Plaintiffs and potentially less coverage to them. Plaintiffs, however, have not shown that such harm rises

to the level of being irreparable since they concede that health care coverage is not being eliminated completely. Therefore, this factor weighs in favor of denying injunctive relief.

### D. SUBSTANTIAL HARM TO OTHERS

Plaintiffs contend that no harm to others would result from the Court's entry of an injunction. Defendants do not appear to address this issue in their response brief. Any harm in issuing an injunction, however, would likely cause the City's financial troubles to continue. This financial distress directly affects the City's residents and—according to statements made by Defense counsel at the July 10, 2012, hearing—will cause the eventual elimination of all health care benefits for Plaintiffs. Thus, based upon the record before the Court, this factor seems to weigh slightly in favor of Defendants.

### E. PUBLIC INTEREST

Plaintiffs claim that the public interest would be served by entry of an injunction since doing so would: (1) maintain the City's contractual obligations and thus preserve retiree health coverage; (2) prevent a reduction in the level of care retirees with preexisting conditions receive from their physicians; and (3) ensure that retirees have access to medically necessary prescription drugs and their current physicians. Defendants do not appear to address this issue in their response. Again, however, the Court notes that furtherance of the City's financial problems would likely result in less services being provided for the City's residents and potentially, the discontinuation of all of Plaintiffs' health benefits. Therefore, this factor weighs in favor of neither Plaintiffs nor Defendants.

### IV. CONCLUSION

Accordingly, and for the reasons set forth above, it is HEREBY ORDERED that Plaintiffs' request for a Preliminary Injunction [dkt 2] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's state-law claims (Counts IV–VIII) are hereby DISMISSED WITHOUT PREJUDICE. The Court retains jurisdiction over Plaintiff's federal claims (Counts I–III).

IT IS SO ORDERED.

Date: July 17, 2012

s/Lawrence P. Zatkoff<br>
LAWRENCE P. ZATKOFF<br>
U.S. DISTRICT JUDGE