UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THE CITY OF PONTIAC RETIRED
EMPLOYEES ASSOCIATION, DELMER
ANDERSON, JOHN CLAYA, THOMAS
HUNTER, HENRY C. SHOEMAKER,
YVETTE TALLEY and DEBRA WOODS,

      Plaintiffs,

                                            Case No. 12-12830

v.

LOUIS SCHIMMEL, INDIVIDUALLY                HON. AVERN COHN
AND IN HIS CAPACITY AS EMERGENCY
MANAGER OF THE CITY OF PONTIAC,
CATHY SQUARE, INDIVIDUALLY AND
IN HER OFFICIAL CAPACITY AS
DIRECTOR OF THE HUMAN RESOURCES
AND LABOR RELATIONS DEPARTMENT
OF THE CITY OF PONTIAC AND
THE CITY OF PONTIAC,

      Defendants.

_____/

## MEMORANDUM AND ORDER
## GRANTING PLAINTIFFS' AND DEFENDANTS' JOINT MOTION FOR FINAL
## APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 78)
## AND
## GRANTING PLAINTIFF'S REQUEST FOR ATTORNEY FEES (Doc. 79)
## AND
## OVERRULING OBJECTIONS TO SETTLEMENT (Docs. 80, 81, 82, 83, 84, 86, 91, 93)

## <u>TABLE OF CONTENTS</u>

I.      Introduction                                                    1

II.     Initial Findings                                               2

III.    Essential Terms of the Settlement Agreement    5

IV.     Objections                                                     7

        A.      Class Member Objections                       7
                1.      Floyd Baker                                  7
                2.      Peal Barefoot                               7
                3.      Edward Pilchowski                       8
                4.      Joseph Solonika                          8

        B.      Hospital Retiree Objections                    9
                1.      Future Funding                             9
                2.      Necessary Parties                        9
                3.      Legality                                       11
                4.      Five Year Notice                          15

V.      Additional Findings                                      16

I. Introduction

This is a dispute over the continuation of health care benefits. In 2012, plaintiffs the City of Pontiac Retired Employees Association, and several individuals sued defendant Louis Schimmel in his capacity as Emergency Manager for the City of Pontiac and the City of Pontiac asserting claims under 42 U.S.C. § 1983 and 11 U.S.C. § 903. Plaintiffs, seeking to represent a class of approximately 1,500 City of Pontiac retirees, surviving spouses and other eligible dependents, claimed that the Emergency Manager's 2011 order that resulted in the reduction and eventual elimination of health care benefits for certain Pontiac retirees violated the constitution and the collective bargaining agreement. In place of the health care benefits, the Emergency Manager provided City retirees with a temporary, fixed $400.00 monthly heath care benefits.

Plaintiffs essentially claimed that the collective bargaining agreement provided for lifetime, unalterable retiree health care benefits. Defendants asserted that plaintiffs do not have a vested right to lifetime heath care benefits.

The case traveled to the Court of Appeals for the Sixth Circuit[1] and was reassigned to the undersigned on remand. See Doc. 34. On remand, the parties began to explore settlement through a mediator. These efforts continued from 2015 to 2017. Finally, in March of 2017 the parties reached a settlement to (1) end this litigation, (2) limit the City's liability for future retiree health care benefits, and (3) restore health care benefits to the proposed plaintiff class.

The Court granted the parties' joint motion for class certification, preliminarily

---

[1]See City of Pontiac Retied Employees Ass'n v. Schimmel, 751 F.3d 427 (6th Cir. 2014).

1

approved the settlement and class notice and set a fairness hearing. (Doc. 72).

Before the Court is the Parties' Joint Motion for Approval of a Class Action Settlement (Doc. 78) and Plaintiffs' Motion for Attorney Fees (Doc. 79). Also before the Court are objections to the settlement from a small handful of class members and from the Pontiac General Hospital Retirees Group (Hospital Retirees). See Docs. 80, 81, 82, 83, 84, 86, 91, 93.

For the reasons that follow, the motion for final approval is GRANTED. Plaintiff's motion for attorney fees is also GRANTED. The objections to the settlement are OVERRULED.

## II. Initial Findings[2]

1.     The Court has jurisdiction over the subject matter of this action and all Parties to the action, including all members of the Settlement Class.

2.     On June 13, 2018, under Fed. R. Civ. P. 23(b)(1) and (2), the Court preliminarily certified the following Settlement Class:

> Approximately 1,500 City of Pontiac retirees who are members of the General Employee Retirement System (excluding hospital employees and retirees), police and fire retirees, and certain executive employees who have received retiree health care benefits from or through the City of Pontiac, as well as their spouses, surviving spouses and eligible dependents who receive or who have received health benefits from the City of Pontiac. This class shall only include those retirees and vested deferred retirees [including Housing Commission retirees who are eligible for retiree health benefits who had at least ten years of service credits at the time of separation], and their eligible spouses and dependents, who were eligible for health insurance coverage at the time that Emergency Manager Louis Schimmel issued his orders limiting and/or terminating retiree health benefits, and will not include any retiree who retired or vested after the date of those orders.

---

[2]Additional findings pertaining to the reasonableness of the settlement and affect of the settlement are found in Part V., beginning on page 16.

3.      The Court finds that the Settlement Class meets all requirements of Fed. R. Civ. P. 23(a) for certification of the class claims in the Complaint, including: (a) numerosity; (b) commonality; (c) typicality; and (d) adequacy of the class representatives and Class Counsel.

4.      Additionally, the prerequisites of Fed. R. Civ. P. 23(b)(1) have been satisfied, because the prosecution of separate actions by individual members of the Settlement Class will create a risk of: (I) inconsistent or varying adjudication which will establish incompatible standards of conduct for Defendants; and (iii) adjudications with respect to individual Settlement Class members, which will, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or will substantially impair or impede their ability to protect their interests.

5.      Alternatively, the prerequisites of Fed. R. Civ. P. 23(b)(2) have been satisfied, since Defendants have acted or refused to act on grounds generally applicable to the Settlement Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Settlement Class as a whole.

6.      Pursuant to Fed. R. Civ. P. 23(a), the Court finds that Plaintiffs John Claya, Thomas Hunter, Henry C. Shoemaker, Yvette Talley and Debra Woods  are members of the Settlement Class, their claims are typical of those of the Settlement Class and they fairly and adequately protected the interests of the Settlement Class throughout the proceedings in this Action.  Accordingly, the Court appoints Plaintiffs John Claya, Thomas Hunter, Henry C. Shoemaker, Yvette Talley and Debra Woods as Class Representatives.

7.      Having considered the factors set forth in Fed. R. Civ. P. 23(g)(1), the

Court finds that Class Counsel have fairly and adequately represented the Settlement Class for purposes of litigating, entering into and beginning implementation of the Settlement, and thus appoints The Law Offices of Gregory T. Gibbs as Class Counsel to represent the members of the Settlement Class.

8.     Class Counsel has moved for attorneys' fees under Federal Rule of Civil Procedure 23(h).  The Parties have stipulated to an award of fees and costs as follows:

$4,725.00 for work performed by paralegal Kellie Dixon

$42,675.00 for work performed by attorney Gregory Gibbs

$239,600.00 for work performed by attorney Alec Gibbs

Costs in the amount of  $9,653.76.

The Court finds the amount to be fair and reasonable.[3]  Accordingly, Class Counsel's Motion is GRANTED.  Class Counsel is awarded attorney fees and costs in the amount of $296,653.76.

9.     In its June 13, 2018 Order, the Court directed that Class Notice be given by specific methods.  Pursuant to this Order, the Parties sent Notice on July 26, 2018 by: (a) directing by US mail, paper copies of the Notice and Settlement Agreement to

---

[3]The Hospital Retirees object to the attorney fee award, contending the settlement agreement is illegal, Plaintiffs are not a prevailing party, and that Plaintiffs' counsel lacks public pension law experience.  See Doc. 82.  These objections lack merit.  The legality of the settlement agreement will be addressed in the context of the Hospital Retiree's objections.  As to whether Plaintiffs are a prevailing party, the agreement, which is to be enforced by consent judgment, controls the analysis.  See Buckhannon Bd & Care Home v W Va Dep't of Health & Human Resources, 532 US 598, 604 (2001)("In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees.")(citations omitted).  Thus, Plaintiffs are properly considered a prevailing party entitled to attorney fees.  Moreover, there is no basis for contesting Plaintiffs' counsel's experience in public sector pension law.

each member of the Class at their address; (b) publishing copies of the Notice and Settlement Agreement on the City of Pontiac's website at the following address: http://pontiac.mi.us/about/forms_minutes_and_agendas.php ; and (c) by publishing Notice of the Settlement in a single issue of the Oakland Press.

10.     These Notices advised Class Members of the terms of the Settlement; the September 12, 2018 Final Fairness Hearing and the right to appear at such Final Fairness Hearing; the inability to opt out of the Settlement Class; right to object to the Settlement; and the procedures for exercising such rights; and the binding effect of this Judgment, whether favorable or unfavorable, to the Settlement Class, including the scope of the Released Claims described in the Settlement Agreement.

11.     The Class Notice met all applicable requirements of the Federal Rules of Civil Procedure, the United States Code, the United States Constitution, 28 U.S.C. § 1715, and any other applicable law.  The Court further finds that Notice in the form approved by the Court fully complied with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA"), and that it constituted the best practicable notice under the circumstances.  The Court further finds that the form of notice was concise, clear and in plain, easily understood language, and was reasonably calculated under the circumstances to apprise of the pendency of the Action, the claims, issues and defenses of the Settlement Class, the definition of the Settlement Class certified, the right to object to the proposed Settlement, the right to appear at the Final Fairness Hearing, through counsel if desired, and the binding effect of a judgment on members of the Settlement Class, including the scope of the Release Claims described in paragraph 4 of the Settlement Agreement.

III.  Essential Terms of the Settlement Agreement

Under the Settlement Agreement, the City of Pontiac will pay an initial amount of $4,250,000 to resolve this lawsuit.  Where additional annual contributions towards the cost of retiree health benefits are required as determined by an actuary, the City of Pontiac will contribute an annual amount of up to $1,500,000.  These settlement amounts will be used, in part, to form a trust that will constitute a Voluntary Employees' Benefits Association ("VEBA") under § 501(c)(9) of the United States Internal Revenue Code to provide retiree health benefits for class members and Plaintiffs into the future. The VEBA will be governed, operated and managed by Board Members according to the terms of the Settlement Agreement.  Because the City of Pontiac's General Employees Retirement System ("GERS") Pension Plan is significantly overfunded, the Settlement Agreement will result in the termination of the current GERS Pension Plan, the establishment of a new Pension Plan that will receive assets equal to 130% of the liabilities of the old Pension Plan and the transfer of the remaining assets from the old Pension Plan that exceed 130% of the old Pension Plan's liabilities, to the VEBA. The VEBA Plan, and the funds contributed to it, will be used to provide specific, agreed-upon healthcare benefits (including but not limited to vision and health care) to the retirees, spouses and dependents in the class.  The $4,250,000 payment shall be paid within 90 days of the date the new VEBA is approved by the Internal Revenue Service, or the date the new VEBA is created, whichever comes later in time.  The annual payment of up to $1,500,000 will be paid to the VEBA on or before June 30 of the fiscal year in which an annual contribution is determined to be required by an actuary. The first annual contribution of up to $1,500,000 will be due within one (1) year and six (6)

6

months of the date that an actuarial valuation determines that a contribution to the new VEBA is required.

IV.  Objections

A.  Class Member Objections

The record contains objections from four (4) class members which represents less than .3% of the approximately 1,500 retirees, spouses and dependents class members covered by the Settlement Agreement.  "This extremely minimal level of opposition represents significant support by the class for the Settlement Agreement." IUE-CWA v GMC, supra, 238 F.R.D. 583, 600 (E.D. Mich. 2006).  Each class member's objection is considered in turn below.

1.  Floyd Baker (Docs. 81, 83)

An objection submitted by Floyd Baker states that he would "rather take the $20,000 dollars because the way the City of Pontiac" treated him was unfair. Specifically, he objects to their removal of health and dental coverage, and Baker believes that he should be able to keep the additional retirement payment of $400.00. He claims that the reduction in his pension will not be enough to live on.  Whether or not the settlement agreement is approved, the $400 payment from the pension fund is time limited and would have disappeared much earlier but for the extensions made by the City of Pontiac as a result of this ongoing litigation.  Accordingly, Baker's objections do not provide any basis for rejecting the settlement.

2.  Pearl Barefoot (Doc. 80)

An objection submitted by Pearl Barefoot indicates that she would also prefer the

continuation of a $400 monthly cash stipend. This is not an option for the reasons discussed above. While Barefoot believes that this would serve the majority of Plaintiffs better than the settlement agreement that is before the Court, the paucity of objections strongly suggests otherwise. The Court also notes that the $400 payment is nowhere near the monthly value of the negotiated level of health care coverage under this settlement proposal. Barefoot's objection is not grounds for rejecting the settlement.

### 3. Edward Pilchowski (Doc. 84)

An objection submitted by Edward Pilchowski indicates that he is concerned that they were not given a vote on "losing our current Blue Cross Blue Shield coverage." At the moment, however, the City of Pontiac is not paying for any coverage, whether through Blue Cross Blue Shield or another insurer. Any coverage that Pilchowski has is coverage that he is free to continue to purchase on his own, and the settlement agreement will not change that. Accordingly, his objection does not provide a basis for rejecting the settlement proposal.

### 4. Joseph Solonika (Doc. 86)

The final objection of by Joseph Solonika, much like the Objection of the Hospital Retirees, is primarily focused on the alleged risk to the Pontiac pensions. For the reasons that will be discussed below, this is not a basis for rejecting the proposed settlement. Finally, Solonika would prefer a one time payment for the opt-out of $30,000 because it would last longer than the $20,000 would in covering his current Medigap and prescription drug policy. However, the Opt Out Option was not designed to pay for alternative health care coverage, but to provide a benefit to those individuals who already have alternative coverage available or who, for whatever reason, do not

wish to receive coverage through the New VEBA.

B.  Hospital Retiree Objections (Docs. 82, 91, 93)[4]

1.  Future Funding

The Hospital Retirees are concerned that the future funding for the new GERS Plan is uncertain because of market conditions.  This is not a relevant objection because it will be true whether or not the Settlement Agreement is accepted or rejected.  In fact, without a solution to the City of Pontiac's outstanding debts to retirees through this settlement proposal, there is a risk that the City of Pontiac could face a future bankruptcy filing that would not only threaten retiree health care, but also retiree pensions.  The resolution of this litigation removes any immediate threat of short term cash insolvency and safeguards both pensions and health care without reducing pensions at all.  Moreover, the agreement also mandates that the new pension fund's private equity investments receive greater scrutiny by requiring one additional vote beyond what is required for other investments.  Altogether, these provisions strengthen the position of the City of Pontiac, secure the guaranteed accrued financial benefits promised to all retirees, and provide for health care coverage for those retirees who were promised health care in retirement.

2.  Necessary Parties

The Hospital Retirees also object to the Settlement Agreement on the grounds

---

[4]The Hospital Retirees also filed a motion to intervene (Doc. 55) seeking to present their objections.  The Court found the motion was premature in light of the fact that at the time the motion was filed, the Court had not seen, which less preliminarily approved the settlement.  See Doc. 62.  Given that the Hospital Retirees have been permitted to fully present their objections to the settlement in open court and in filings, the motion to intervene is now MOOT.

that the Retirement Board is a necessary party to this litigation because it is the only body empowered to administer the pension fund assets, citing <u>Bd. Of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit v. City of Detroit</u>, 143 Mich. App. 651, 656 (1985). This case, however, only addressed a situation in which retention of independent legal counsel was necessary to conduct the affairs of the retirement system. It does not give the Board unfettered discretion to retain counsel for the purpose of intervening in cases that do not involve the administration of trust assets. <u>Cf Bd. of Tr. of Flint Retirement Sys. v. City of Flint</u>, 2005 Mich. App. LEXIS 506 (Ct App, Feb. 24, 2005) (unpublished).

Here, the Settlement Agreement does not actually affect the administration of the funds of the system; it only calls for termination and re-establishment of that system if the IRS approves the transaction. The investment and management of the funds will at all times be handled by the Retirement Board, and there will be no interruption in its regular functions. Given the fact that independent counsel for the GERS Board has already laid out the legal framework for the proposal in consultation with the attorneys in mediation, and given the Board's lack of interest in intervening or submitting objections, there is no basis for concluding that the GERS Board has anything other than an incidental, bystander role in this lawsuit. As previously noted by Defendants in their reply brief in opposition to the Hospital Retirees' Response to the Joint Motion for Preliminary Approval, plan terminations, which is what the Settlement Agreement requires, is a settlor function reserved to the plan sponsor (i.e., the City of Pontiac), and not the Trustees. Thus, this argument does not carry the day.

3.  Legality

The Hospital Retirees also contend that the Settlement Agreement is illegal. During the September 12, 2018 fairness hearing on the Parties' Joint Motion for Final Approval of Class Action Settlement, the Court requested that the Parties submit a supplemental brief providing authority indicating that the City of Pontiac can – as part of the Settlement – terminate the overfunded Pontiac General Employees Retirement System, create a new pension system and use a portion of the overfunding to fund a VEBA that provides health benefits to the Class Members, i.e. demonstrate the legality of the Settlement Agreement.  The Parties provided that authority on September 27, 2018 (Doc. 90).  The Hospital Retirees responded (Doc. 91), the Parties replied (Doc. 92) and the Hospital Retirees replied (Doc. 93).

As the Parties point out, the Internal Revenue Code (IRC), the Code of Federal Regulations, and pertinent guidelines expressly allow the termination of an overfunded pension plan and the reversion of its assets to a newly formed plan.  Under the IRC, "A trust…forming part of [a pension plan] shall constitute a qualified trust… if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the [trust assets] to be used for, or diverted to, purposes other than for the exclusive benefit of participants or their beneficiaries…"  IRC Section 401(a)(2).  The accompanying regulations, 26 C.F.R. §1.401-2(b)(1), provides:

> The intent and purpose in section 401(a)(2) of the phrase "prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust" is to permit the employer to reserve the right to recover at the termination of the trust, and only at such termination, any

balance remaining in the trust which is due to erroneous
actuarial computations during the previous life of the trust.
A balance due to an "erroneous actuarial computation" is
the surplus arising because actual requirements differ from
the expected requirements even though the latter were based upon
previous actuarial valuations of liabilities or determinations of costs of
providing pension benefits under the plan and were made by a person
competent to make such determinations in accordance with reasonable
assumptions as to mortality, interest, etc., and correct procedures relating
to the method of funding.

The Internal Revenue Manual (IRM), specifically section 7.12.1.17.1.2 titled "Reversion

of Excess Assets" states that:

In general, no part of a qualified plan's trust may revert to
the employer, but a reversion may occur under certain
circumstances… For overfunded DB plans, reversions are
only permitted on plan termination if the plan has met all
liabilities for the participants and their beneficiaries.

Finally, the IRC contemplates the tax consequences for reversion after plan termination

under section 4980(d), and although these tax consequences are not applicable to

government benefit plans, see IRC Section 4980(c)(1), the presence of this provisions

confirms yet again that reversion of assets after plan termination is allowable under the

Code.  Accordingly, federal law, authority and guidelines expressly permit plan assets

from a terminated, overfunded benefit plan to revert back to the plan sponsor, i.e. the

City of Pontiac.

The IRS also permit the City of Pontiac to purchase annuity contract for all

beneficiaries of the GERS Plan, including the Hospital Retirees.  Under the IRC, "A

trust… forming part of [a pension plan] shall constitute a qualified trust… if under the

trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with

respect to employees and their beneficiaries under the trust, for any part of the [trust

assets] to be used for, or diverted to, purposes other than for the exclusive benefit of participants or their beneficiaries…" IRC Section 401(a)(2).  IRS guidance also specifically provides for the plan sponsor/employer to recover – as the Settlement Agreement properly provides for here – surplus assets in the pension plan.  Under IRS Publication 6392 (Rev. 4-2016), Miscellaneous Provisions:

> When an employer terminates an overfunded defined benefit plan, receives the excess assets, and then establishes a new defined benefit plan covering the active employees ("termination/reestablishment" transaction), the employer may not recover any surplus assets until it has fully vested all participants' accrued benefits and has made lump sum distributions or purchased guaranteed annuity contracts to protect accrued benefits.

Based on the above, the IRS will likely require the City of Pontiac to, prior to actually recovering surplus assets from a terminated overfunded benefit, purchase guaranteed annuity contracts to protect accrued benefits.

In light of the IRS's anticipated action, the Hospital Retirees cannot credibly contend that they will be harmed by the Settlement Agreement.  The Hospital Retirees' pension benefits are not currently secured by annuities; thus the new Pension Plan will provide a higher level of protection of plan assets.  Moreover, the Settlement Agreement has two procedural safeguards that are not present in their current plan: a supermajority vote whenever the new Pension Board votes to invest in an y alternative investments, such as real estate or hedge funds, and (2) a supermajority vote when the new Pension Board votes on any investment is the new Pension Plan is under 90% funded.

As the Parties have explained, once the Court approves the Settlement Agreement, and the IRS approves the Settlement Agreement with a requirement that the City of Pontiac purchase annuities for all beneficiaries and place those annuities

within the GERS Plan, the City of Pontiac will comply. This will alleviate all concerns the Hospital Retirees have and it will fully protect all beneficiaries of the Pension Plan.

The Hospital Retirees also argue that the Settlement Agreement is illegal based on the holding in Wayne Co. Employees Retirement Sys. v. Charter Co. of Wayne, 301 Mich. App. 1 (2013), aff'd in part and vacated in part, Wayne Co. Employees Retirement Sys. v. Charter Co of Wayne, 497 Mich 36 (2014). In Wayne Co., the Michigan Court of Appeals and the Michigan Supreme Court were confronted with an unusual program that allowed Wayne County to offset constitutionally mandated actuarially required contributions (ARC) to its MERS guidelines require a transfer of 110% of a system. Essentially, the assets of the system were being used to benefit Wayne County, violating the rule that assets be used for the exclusive benefit of the fund's beneficiaries.

Here, the Settlement Agreement does not actually divert system assets, but creates a new system altogether and even then only with IRS approval. The new system will be one with an actual surplus, that is fully funded and capable of meeting all liabilities for pension payments. Moreover, the actual suprlus that is maintained is a substantial one: thirty percent above and beyond what is actuarially required to meet the required actuarial obligations to all GERS retirees, providing a substantial cushion. Finally, unlike the scheme at issue in Wayne County, nothing in the Settlement Agreement affects the City of Pontiac's annual required contribution to the existing or new general employees retirement system, nor does it offset any annual required contribution based on contributions made to a separate fund.

The Hospital Retirees also object to the Settlement Agreement because they will

14

not longer receive the $400 monthly benefit instituted by the Emergency Manager. The record is clear that the increase in the monthly benefit approved by the Emergency Manager in 2013 was temporary and is not an accrued financial benefit. Thus, this is not a valid objection.

In sum, and as fully explained in the Parties' papers, the Settlement Agreement does not run afoul of state or federal law.

### 4. Five Year Notice

The Hospital Retirees also argue that the Settlement Agreement should have provided a five year advance notice as provided by ERISA. This is incorrect. Under ERISA § 4044(d)(2), "distribution to the employer from a plan shall not be treated as failing to satisfy the requirements of this paragraph if the plan has been in effect for fewer than 5 years and the plan has provided for such a distribution since the effective date of the plan." 29 U.S.C. § 1344(d)(2)(B).

This ERISA section does not apply if the plan at issue "is a governmental plan." 29 U.S.C.A. § 1003(b)(1). "The term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C.A. § 1002(32). Both the current and proposed plans are established and maintained by the City of Pontiac, which is a political subdivision of the State. Halttunen v. City of Livonia, 664 F. App'x 510, 512 (6th Cir. 2016) ("cities in Michigan are deemed political subdivisions by statute."); see also Ganson v. Detroit Pub. Sch., 2017 WL 6943424, at *2 (E.D. Mich. Dec. 11, 2017), ("the Michigan Public Schools Employee Retirement System [ ] is maintained by the State of

Michigan. As such, it is a governmental plan, and ERISA's provisions do not apply to it"). Thus, the Court can approve the Settlement Agreement in the absence of a five year waiting period prior to plan termination.

V. Additional Findings

12.     The Court finds after the hearing and based upon all submissions of the Parties and interested persons that the Parties' proposed Settlement Agreement is fair, reasonable and adequate. The Settlement Agreement is consistent with and in compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Code, and the United States Constitution, and other applicable law. The Court additionally finds that:

(a)     The terms and provisions of the Settlement Agreement were entered into by experienced counsel and only after extensive, arm's-length negotiations conducted for two years, in good faith, with the assistance of two highly-regarded and experienced private facilitators. The negotiations involved the parties' counsel in face to face meetings, telephone conversations and written communications. The parties exchanged and evaluated proposals and counter-proposals. The Settlement Agreement is not the result of collusion, nor is it illegal.

(b) The Parties' dispute is genuine, the outcome of continued litigation is uncertain, and that continued litigation would carry substantial risks for both sides, and that, in particular, class members would bear the risk that continued litigation would leave them with nothing if they were to lose on the merits, and perhaps nothing as a result of delay. These circumstances militate in favor of a settlement that ends uncertainty, avoids further delay, eliminates risk, promptly ameliorates hardship, and

provides significant benefit to each side and to the class as a whole.

(c) The negotiations followed robust motion practice and litigation, including Plaintiffs' request for injunctive relief, Defendants' staunch opposition to that relief, the district court's denial of that relief, Plaintiffs' appeal to the Sixth Circuit Court of Appeals, continued litigation, briefing and oral argument at the Sixth Circuit, and further litigation following the Sixth Circuit's remand of the case to this Court. The minimum amount of formal discovery completed in this case in no way undermines the integrity of the settlement given the extensive investigation that has occurred as a result of proceedings thus far.

(d) These proceedings gave counsel opportunity to adequately and fully assess this case's strengths and weaknesses – and thus structure the Settlement Agreement in a way that adequately accounts for those strengths and weaknesses. Class Counsel were cognizant that there was no guarantee of success in their efforts to prevail on the merits before this Court, and that losing on the merits would mean the Plaintiffs would receive nothing. The Court is familiar with counsel for both sides from this litigation, and recognizes their experience and diligence and concludes that their endorsement of the settlement is entitled to significant weight.

(e) Approval of the Settlement Agreement will result in substantial savings of time, money and effort for the Court and the Parties, and will further the interests of justice. Defendants deny and continue to deny the allegations raised against them, raised various factual and legal arguments in support of their defense, and have asserted that the labor agreements at issue do not obligate them to continue or provide any retiree healthcare benefits, and that the Emergency Manager's actions were

17

appropriate and with the requisite authority. History confirms that litigating retiree health benefit disputes involves risk and uncertainty, and typically produces a "zero sum" result.

(f) The Settlement Agreement is a rational and salutary resolution of contested, uncertain, protracted and risky litigation. The Settlement Agreement is informed, prudent, within an appropriate range of reasonableness and beneficial to all parties and Class Members.

13. All members of the Settlement Class are bound by this Judgment and by the terms of the Settlement Agreement, including the scope of the Released Claims described in the Settlement Agreement.

14. Nothing in the Settlement Agreement, this Order or the Consent Judgment, nor the fact of the settlement constitutes any admission by any of the Parties of any liability, wrongdoing, or violating of law, damages or lack thereof, or of the validity or invalidity of any claim or defense asserted in this case. If the Settlement Agreement is not upheld on appeal, or is otherwise terminated for any reason, the settlement and all negotiations, proceedings, and documents prepared, and statements made in connection therewith, shall be without prejudice to any Party and shall not be deemed or construed to be an admission by any party of any fact, matter, or position of law; all Parties shall stand in the same procedural position as if the Settlement Agreement had not been negotiated, made, or filed with the Court.

15. All claims which were pled or could have been pled in the complaint are DISMISSED and all Released Claims identified in the Settlement Agreement against all persons and entities named in the Release provisions and without costs to any of the

Parties as against the others.  As set forth in the Settlement Agreement, the Plaintiffs and all members of the Settlement Class, release all claims and causes of actions asserted against Defendants in the Complaint(s) filed by Plaintiffs in this Action, and as otherwise set forth in the Settlement Agreement.

16.     A Consent Judgment will be entered in favor of Plaintiffs pursuant to the terms of the Settlement Agreement.

17.     The Court retains jurisdiction over the implementation, administration and enforcement of the Consent Judgment and Settlement Agreement, and all matters ancillary thereto.

18.     This Order resolves all pending claims in this matter and closes this case.

SO ORDERED.


                                        S/Avern Cohn_____
                                        AVERN COHN
                                        UNITED STATES DISTRICT JUDGE
Dated: 11/19/2018
        Detroit, Michigan