UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE CITY OF PONTIAC RETIRED
EMPLOYEES ASSOCIATION, DELMER
ANDERSON, THOMAS HUNTER,
HENRY C. SHOEMAKER, YVETTE
TALLEY, and DEBRA WOODS, on behalf of
themselves and all others similarly situated,

Case Number 12-12830
Honorable David M. Lawson

          Plaintiffs,

v.

LOUIS SCHIMMEL, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS EMERGENCY
MANAGER OF THE CITY OF PONTIAC, CATHY
SQUARE, INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS THE DIRECTOR OF HUMAN
RESOURCES AND LABOR RELATIONS FOR
THE CITY OF PONTIAC, and the CITY OF
PONTIAC,

          Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFFS'
MOTION TO MODIFY CONSENT JUDGMENT**

    In this class proceeding, the plaintiffs move to modify a provision of a consent judgment entered by the Honorable Avern Cohn in 2018. The consent judgment resolved a dispute between the City of Pontiac and its former employees over the continuation of retiree health benefits by, among other things, establishing a new trust to provide health benefits for the City's retirees. The question presented is whether the Court should modify the consent judgment to require the perpetuation of an interim monthly $400 stipend that was intended to cover health insurance premiums for retirees during the time required for full implementation of other terms of the agreement, which required the City to establish and fund a new benefit plan to take over the

obligations of the old retirement plan. The motion was filed in June 2022. The parties asked the Court to defer ruling on it while they attempted to negotiate a resolution. They apparently reached an impasse, and the Court heard oral arguments on July 18, 2023. Modifying a consent judgment absent an agreement by the affected parties requires a showing that the "decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)). Because the plaintiffs have not carried that burden, their motion will be denied.

I.

The facts and history of this case are familiar to the parties. The Court summarized them in an opinion granting the plaintiffs' earlier motion to enforce this same consent judgment. *See* ECF No. 103. Part of that summary is set forth here for convenience.

The consent judgment entered by Judge Cohn on November 19, 2018, *see* ECF No. 95, resolved a dispute between the City of Pontiac and its former employees over the continuation of retiree health benefits. A key provision of that consent judgment was the establishment of a new trust to provide health benefits for the City's retirees.

Six years earlier, in 2012, the City of Pontiac Retired Employees Association, along with several of its members, sued the City and then Emergency Manager (EM) Louis Schimmel. The plaintiffs proceeded on behalf of themselves and around 1,500 municipal retirees in a challenge to the EM's order substituting a temporary monthly fixed benefit premium assistance payment in lieu of the City's previous guarantee of lifetime retiree health coverage, which was to be reduced and eventually eliminated. Judge Lawrence Zatkoff denied a motion for preliminary injunction, but

that ruling was reversed on appeal. Judge Cohn inherited the case on remand, and he subsequently presided over several years of intense negotiations between the parties.

In March 2017, with the aid of a mediator, the parties finally hammered out an agreement by which the City would be relieved of any perpetual obligation to provide healthcare benefits, in exchange for its commitment to establish and fund a new retiree benefit trust fund, with the seed money for the new fund to be provided largely by liquidation of the former retiree benefit plan. The City was obligated to make an initial payment of $4,250,000, with further annual payments to follow if further funding was determined to be necessary by an ongoing actuarial assessment. Judge Cohn certified a settlement class consisting of most of the City's retirees, but excluding former employees of Pontiac General Hospital, whose employee association had attempted to intervene in the case. He later granted a motion to approve a proposed consent judgment after rejecting the objections of a handful of class members and a challenge to the propriety of the settlement by the hospital retirees. The approved consent judgment was entered by the Court on November 19, 2018.

While this case was pending, a separate suit was filed in state court by the City's retired police officers and firefighters, who made up a subset of the class of retirees in this case. The consent judgment acknowledged the existence of that suit, and it provided that any payments made to settle the claims in that case would be credited against the City's funding obligations assumed under the settlement in this case. The state lawsuit eventually was resolved by a similar agreement, and, in July 2019, judgment entered in the state court awarding $4,073,000 to the police and fire retiree benefit fund. The parties here concur that the judgment recovery in the separate litigation properly was deemed to satisfy the lion's share of the City's initial $4.25 million funding obligation under the terms of the consent judgment in this case.

The parties subsequently brought before the Court a dispute over the deadline for the City's remittance of the remaining approximately $176,000 in initial funding that was called for by the consent judgment. On April 6, 2021, the Court granted the plaintiffs' motion to enforce the consent judgment and ordered the City "forthwith [to] tender the remainder of the funds due the New VEBA [Voluntary Employee Beneficiary Association] trust." Op. & Order, ECF No. 103, PageID.2414.

The terms of the consent judgment were spelled out in the parties' settlement agreement, which was made part of the record in this case and incorporated by reference into the consent judgment. The parties to the settlement agreement were identified as the City of Pontiac Retired Employees Association; the individuals named as plaintiffs and class representatives in this case, acting on behalf of themselves and absent members of the settlement class; the City of Pontiac; and its officials who were named as defendants. The agreement provided that the historical Pontiac General Employees Retirement System Pension Plan ("GERS") would be terminated, and a new plan would be created and funded with assets equal to 130% of the liabilities of the old plan. Any assets from the GERS liquidation in excess of 130% of plan liabilities were to be rolled over into a Voluntary Employee Beneficiary Association Plan (the "New VEBA Plan"), governed by Section 501(c)(9) of the Internal Revenue Code. That New VEBA Plan then would provide for ongoing retiree health benefits, and the City would be absolved of any perpetual obligation to supply the same. The City agreed that it would seek an IRS determination that the New VEBA Plan was appropriately constituted for tax-exempt status, and, upon receiving IRS approval, that it would pay initial funding into the plan trust fund. The parties also acknowledged the police and firefighters' litigation and provided for the offset of any settlement funds paid by the City in that case. Finally, the agreement stated that it would be governed by federal law and Michigan state

law, as applicable, and that it "may not be modified except in writing signed by or on behalf of all parties and, as necessary, with Court approval."

On March 23, 2020, the City of Pontiac and the appointed trustees of the New VEBA Plan executed a Trust Agreement establishing the new benefit plan's trust fund. As noted earlier, assets of the Old GERS Plan in excess of 130% of its future liabilities were to be transferred into the New VEBA Plan to fund ongoing health benefit premiums. Assets equal to 130% of the Old GERS Plan liabilities were to be rolled over to a New GERS Plan (referred to here by the parties as "REGERS"). *See* Settlement Agrmt. ¶ 6, ECF No. 78-2, PageID.1426 ("The City of Pontiac will terminate the General Employees Retirement System Pension Plan ('GERS Plan') and establish a new GERS Plan, which will receive assets equal to 130% of the pension liabilities of the old GERS Plan.").

It is undisputed that the preliminary funding of the New VEBA and REGERS plans was accomplished as mandated, after the Court resolved the dispute over the funding deadline for the New VEBA Plan. The Settlement Agreement specified that the funds allocated to the New VEBA Plan would be used to provide City retirees with health benefit coverage meeting certain requirements for medical, dental, vision, and life insurance. *See* Settlement Agrmt, ¶¶ 9-11, PageID.1429-30. The agreement further provided that an interim monthly stipend which the City had been paying to retirees to cover their healthcare premiums would be continued "until, but not beyond, such time as the U.S. Internal Revenue Service has approved the new Plans identified in this agreement, and they have begun operation and are providing the benefits identified in this Agreement." *Id.* ¶ 13, PageID.1430. It is undisputed that the $400 per month stipend was provided to retirees through January 2022, but the stipend was discontinued in February 2022 after the

transition of the benefit plans was completed and the New VEBA Plan fully assumed and began to perform its benefit obligations.

In their present motion, the plaintiffs seek a modification of the consent judgment to require that the previous $400 monthly stipend be made permanent. That could be accomplished, they contend, without endangering any of the funding margins going forward. They explain that Old GERS eventually transferred approximately $427,000,000 to the REGERS plan (based on the undisputed initial assessment of the mandated 130% funding level for REGERS' prospective pension obligations), and that it transferred an excess of $84,000,000 to the New VEBA Plan to fund ongoing healthcare benefits. They assert, however, that Old GERS presently holds between $50 million to $60 million of additional excess funds that, per the terms of the settlement agreement, are required to be transferred to the New VEBA Plan. The plaintiffs retained an independent actuary who evaluated the financial situations of REGERS and VEBA and determined, based on certain prospective assumptions, that the New VEBA Plan could fund all of its ongoing obligations with the funding that already has been received by it, and that the cost for the REGERS plan to provide a permanent $400 "pension benefit enhancement" would be less than the excess funds presently on hand and allocated for transfer to the New VEBA Plan.

The parties' factual disputes at this point center on the assumed prospective rate of return that the REGERS and VEBA Plans are expected to achieve and the resulting implications about any excess or deficiency in their respective funding margins. According to an analysis prepared by GERS' own actuary, which used a conservative assumption of a 4.5% annual rate of return, if the REGERS plan were required to pay out an additional $400 per month, then, after complying with the settlement agreement and transferring the designated excess funds to VEBA, REGERS would be funded at only 129% of its projected future obligations, with no excess funds available.

*See* Plfs' Actuarial Report, ECF No. 131-1, PageID.2712. The plaintiffs' independent actuary, however, opined that a more generous assumed annual rate of return of 6.5% to 7.0% was more appropriate for the analysis, and that using those higher rates — while still accounting for the additional funds required to provide the ongoing additional $400 per month "pension benefit enhancement" payment — REGERS presently is overfunded by 157 to 164%, and VEBA is overfunded by 135 to 142%. *Id.* at PageID.2712-13. The plaintiffs' actuary concluded that, based on his assumptions, it would be possible, therefore, for REGERS to retain all funds not yet transferred to VEBA, without detriment to the future obligations of either plan.

The defendants oppose the modification, arguing, among other things, that regardless of which rate of return is appropriate, the plaintiffs have not established any legal or equitable basis for modifying the consent judgment.

II.

"'A consent decree has attributes of both a contract and of a judicial act.'" *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "'Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.'" *Ibid.* (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)). "'[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'" *Ibid.* (quoting *Armour*, 402 U.S. at 682). "The consent decree is a judicial act because it 'places the power and prestige of the court behind the compromise struck by the parties.'" *Ibid.* (quoting *Williams*, 720 F.2d at 920).

"In the absence of controlling federal law, contractual interpretation of [a] [c]onsent [j]udgment is governed by [state] law," and "[u]nder Michigan law, '[t]he primary goal in the

construction or interpretation of any contract is to honor the intent of the parties.'" *Ibid.* (quoting *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994)). "A court 'must look for the intent of the parties in the words used in the instrument.'" *Ibid.* (quoting *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941)). "[D]istrict courts retain jurisdiction to enforce their own orders, including [consent judgments entered by their authority]." *City of Highland Park v. EPA*, 817 F. App'x 42, 51 (6th Cir. 2020) (citing *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 871 (6th Cir. 2015) ("[W]hen a court enters a consent decree, it retains jurisdiction to enforce the decree.")).

A court's power to enforce a consent decree includes the "inherent equitable power to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio*, 132 F.3d at 1146 (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)). This power arises from the "injunctive quality of a consent decree," which "compels the approving court to . . . modify the decree if 'changed circumstances' subvert its intended purpose." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994) (quoting *Williams*, 720 F.2d at 920). "[E]ven if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well-settled that 'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.'" *Ibid.* (quoting *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 917 (6th Cir. 1979)). Whether a situation rises to the level where judicial modification is appropriate "is a factual issue for the district court to decide in the first instance." *Waste Mgmt. of Ohio*, 132 F.3d at 1146.

The "Settlement Agreement entered by the parties [in this case] operates as a consent decree — that is, a 'settlement agreement subject to continued judicial policing.'" *Concerned*

*Pastors for Soc. Action v. Khouri*, No. 16-10277, 2023 WL 2215747, at *4 (E.D. Mich. Feb. 24, 2023) (quoting *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)).  A consent decree, in all events when the parties call for judicial intervention, "'should be construed to preserve the position for which the parties bargained.'" *Ibid.* (quoting *Vanguards*, 23 F.3d at 1018).  That includes, necessarily, preserving the terms of the decree when doing otherwise is not demonstrably necessary to achieve justice — or to prevent injustice — arising from execution of the agreement.

The plaintiffs here seek modifications of the decree that would (1) recapture assets slated for transfer to the VEBA Plan and require REGERS to retain those excess funds, and (2) obligate REGERS to pay in perpetuity an additional $400 per month "pension benefit enhancement," on top of the pension benefits that REGERS is obligated to provide under the existing terms.  But nowhere in the consent decree are any terms found which contemplate the financial maneuvering and assumption of new obligations that the plaintiffs propose.

It is undisputed that the parties so far have performed as required by the terms of the consent decree and as ordered by the Court, and no claim has been made that the Plans are financially unable to complete the reallocation of assets or to meet their ongoing benefit obligations as expressly called for in the parties' agreement.  The plaintiffs have made no effort to explain how either of the modifications that they propose are necessary to ensure full performance of the agreement according to the spirit and letter of its terms, or to avoid any looming financial calamity for the Plans or injustice for the beneficiaries.  In short, they have failed utterly to demonstrate the necessary premise for the exercise of the Court's "inherent equitable power to modify a consent decree," which requires them to prove "that the decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio*, 132 F.3d at 1146.

The plaintiffs insist that the appropriate standard for "modification" of the consent decree is supplied by Federal Rule of Civil Procedure 23(e), which states that "[t]he claims, issues, or defenses of a certified class — or a class proposed to be certified for purposes of settlement — may be settled, voluntarily dismissed, or compromised only with the court's approval," which the Court may grant "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e), (e)(2). It is not clear why the plaintiffs believe that this rule provides guidance here, as it says nothing about "modification" of a settlement agreement or consent decree that has been approved by the Court as a final disposition of class claims. The plaintiffs have cited no legal authority holding that Rule 23(e) exclusively governs "modification" of an established consent decree, nor have they cited any decision repudiating the standard set down in *Waste Management*, either in a class proceeding or in any other context involving modification of a consent decree.

The plaintiffs cite *In re Baby Products Antitrust Litigation*, 708 F.3d 163, 175 n.10 (3d Cir. 2013), for their proposition that "Courts generally find that Rule 23(e) applies to a modification of a previously approved settlement only when the settlement will be 'materially alter[ed].'" *See* Plfs.' Supp. Brief, ECF No. 133, PageID.2828. But they overstate the holding of that case. The decision, properly cited, states only that "Class members should be notified of any material alterations to the settlement and permitted to object to them before the Court approves the settlement," noting that a renewed class notice might be required upon remand of the case to the district court. It says nothing about the requirements for modifying a consent decree. And the case does not in any way suggest that Rule 23(e)'s "fair, adequate and reasonable" criteria supply the sole and exclusive regimen for modification of a consummated consent decree in a class case.

The Court previously hewed to all of the requirements of Rule 23(e) when the parties presented their proposed settlement agreement, and, after a fairness hearing was held, entered a consent judgment implementing the terms of that agreement. If the parties today were before the Court with a *joint* proposal to modify the terms of that final decree, then it might be appropriate for class notice to be sent with an opportunity to object and an eventual fairness hearing to be held to approve a renewed compromise. But that procedure is inapplicable where there is (presently) no "settlement" before the Court to "approve."

Moreover, sending a new class notice and convening a fresh fairness review would be appropriate only upon a demonstration in the first instance that the existing consent decree had become either an instrument of injustice or impossible to perform according to its original terms — i.e., upon the satisfaction of the threshold criteria for modification of an established consent decree. The requirements of class notice and Court approval at a fairness hearing merely are additional strictures that would apply because this is a class proceeding. As the *Baby Products* decision noted, the procedural hurdles of Rule 23(e) are *necessary* safeguards to ensure that all class members will have an opportunity to comment on any proposed modification. Those procedures certainly are not *sufficient* standing alone to permit the modification of an intact consent judgment, where there has been no suggestion either that the agreed terms cannot be fulfilled completely, or that doing so would work any manifest injustice on the parties or their respective interests in this settled controversy.

As discussed earlier, the consent decree is both a contract and a judgment. *Evoqua*, 940 F.3d at 229. The settlement feature of the instrument brings with it the reality that it cannot be modified unilaterally. *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 372, 666 N.W.2d 251, 257-58 (2003) (explaining that "the freedom to contract does not authorize a

party to *unilaterally* alter an existing bilateral agreement. Rather, a party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract"). Settlement agreements require the "mutual consent of the parties." *Buchanan v. Northland Grp., Inc.*, 776 F.3d 393, 399 (6th Cir. 2015). There is no mutual consent to modify the consent judgment as the plaintiffs propose.

The judgment aspect of a consent decree weighs heavily here because the Court *was* called upon to approve the settlement as fair, adequate, and reasonable, which required consideration of *all* its terms, including most conspicuously the approved schedule of specific asset allocations among the respective plans. The plaintiffs have not cited any legal authority supporting their unilateral effort arbitrarily to modify those terms after they were consented to by all parties, endorsed by the Court, and made binding by the entry of judgment.

III.

The plaintiffs have failed to show that modification of the consent judgment is warranted, and they have made no effort to make the required showing that the agreement would become an "instrument of wrong" going forward absent their proposed modification.

Accordingly, it is **ORDERED** that the plaintiffs' motion to modify the consent judgment (ECF No. 104) is **DENIED**.

                                                 s/David M. Lawson
                                                 DAVID M. LAWSON
                                                 United States District Judge

Date: August 3, 2023