UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE CITY OF PONTIAC RETIRED
EMPLOYEES ASSOCIATION, DELMER
ANDERSON, THOMAS HUNTER,
HENRY C. SHOEMAKER, YVETTE
TALLEY, and DEBRA WOODS, on behalf of
themselves and all others similarly situated,

Case Number 12-12830
Honorable David M. Lawson

                    Plaintiffs,

v.

LOUIS SCHIMMEL, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS EMERGENCY
MANAGER OF THE CITY OF PONTIAC, CATHY
SQUARE, INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS THE DIRECTOR OF HUMAN
RESOURCES AND LABOR RELATIONS FOR
THE CITY OF PONTIAC, and the CITY OF
PONTIAC,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART JOINT MOTION FOR ATTORNEY'S
FEES AND GRANTING DEFENDANT'S MOTION FOR REIMBUREMENT OF COSTS**

Before the Court is a joint motion by the parties for an order awarding attorney fees and

costs incurred by class counsel in this matter, pursuant to the terms of the approved modification

of the class settlement agreement, and the City of Pontiac's unopposed motion for reimbursement

of $7,538.62 in administrative costs incurred for sending notice to class members of the proposed

settlement modification, per the terms of the second amendment to the settlement agreement.  The

motions are fully briefed, and oral argument will not assist in their resolution. The Court will

decide the motions on the papers submitted.  E.D. Mich. LR 7.1(f)(2).  For the reasons that follow,

the motions will be granted in part.

I.

In 2012, the City of Pontiac Retired Employees Association and six individuals who are former City of Pontiac employees filed this lawsuit for themselves and others similarly situated, bringing claims under 42 U.S.C. § 1983 and 11 U.S.C. § 903. The plaintiffs alleged that the City of Pontiac violated those statutes when, through an emergency manager, it modified collective bargaining agreements to shift retiree health costs to retirees to combat stifling budget deficits, which eventually precipitated a cessation of health care benefits for the plaintiffs. The parties engaged in settlement negotiations, and, with the help of a mediator, they reached a compromise on behalf of the class. Judge Avern Cohn granted the parties' motion to certify a settlement class. *See* ECF No. 72. After notice of the proposed settlement was given, and after addressing a handful of objections from absent class members, Judge Cohn eventually approved the class settlement, which was embodied in a Consent Judgment entered by the Court on November 19, 2018. *See* ECF No. 95.

The plaintiffs later moved to enforce certain provisions of the Consent Judgment relating to funding of two new healthcare benefit trust funds established by the settlement, and their motion was granted by the Court on April 6, 2021. *See* ECF No. 103. However, the plaintiffs were unsuccessful on a second motion to modify the Consent Judgment, which was brought with the aim of continuing permanently a temporary cash stipend of $400 per month for retirees that was included as a makeshift measure to cover healthcare premiums while the newly constituted benefit trust funds were being established. *See* Order Denying Mot. to Enforce Consent Judgment, ECF No. 134. In the wake of that ruling, the parties engaged in lengthy negotiations over prospective revisions to the benefit scheme, which eventually resulted in a renewed compromise whereby the parties agreed to expand the settlement class, modify fiduciary benchmarks established by the

settlement agreement, and permanently reinstitute the monthly stipend for certain class members. The matter came before the Court on a joint motion by the parties for final certification of an expanded settlement class and approval of proposed amendments to the settlement terms. On December 9, 2025, after a fairness hearing at which the Court reviewed the terms of the settlement modification and addressed objections by several class members on the record, the Court granted the motion and finally approved the proposed settlement modification.

The Court certified an expanded settlement class including several dozen retirees who were not included in the original class of approximately 1,500 former City employees, and it approved modifications to the settlement agreement authorizing certain reallocations of funds between the benefit trust funds created under the original settlement agreement, to facilitate the enhancement of certain retiree benefits. The Consent Judgment called for the termination of the City of Pontiac General Employees Retirement System Plan (referred to by the parties as "Old GERS"), with funding from the old trust to be redistributed into two new benefit plans charged with maintaining ongoing benefit programs for City retirees. The first new entity created was the New General Employees Retirement System Plan ("New GERS"), and the second was the New Voluntary Employee Beneficiary Association trust fund ("New VEBA"). The benefit trusts were funded according to the terms of the settlement agreement and remain in operation today carrying out their mandates to provide retiree pension and healthcare benefits. The parties entered negotiations to modify the agreement after fortuitous economic developments allowed the benefit trusts to prosper financially, eventually becoming overfunded in excess of 130% of their prospective future benefit obligations. The Court approved revisions of the Consent Judgment to allow the excess funding in the benefit trusts to be allocated to enhancing retiree benefits in several ways, with some precautionary limitations, as follows:

- An enhanced pension benefit (approximately $400 per month in most cases) is provided for New GERS retirees and their designated beneficiaries corresponding to the pension option chosen by each individual at the time of their retirement.

- The class of retirees eligible for VEBA health care benefits is expanded.

- Expanded benefits also include offering an opt-out payment option for new class members to extend pension benefits to their surviving spouses.

- The City's prospective potential liability for covering any shortfall in the New VEBA trust funding level is reduced over time, in a stepwise fashion, from the current level in excess of $1.5 million to approximately $500,000.

- Enhanced pension benefits will be reduced and potentially eliminated if the New GERS trust fund falls below a 130% funding level.

- Enhanced healthcare benefits would be reduced and potentially eliminated if the New VEBA funding level drops below 115%.

Section 7 of the proposed second amendment to the settlement agreement provided that plaintiffs' counsel would be awarded reasonable attorney's fees, which at the time of filing of the motion for approval of the settlement modification were estimated to be in the range of $325,000 to $375,000. Proposed Second Amendment, ECF No. 137, PageID.2888. The agreement also specified in Section 9 that the City would be reimbursed for the costs of sending notice of the proposed modification to class members. *Id.* at 2889. Additional negotiations to bring the agreement to a conclusion since the proposal was first presented took over a year, and class counsel's request for attorney's fees ballooned to $612,262.50. The amount of the additional work is detailed in the joint motion and is discussed below.

No objections have been presented to either motion.

II.

Typically, the reasonableness of an attorney's fee request is measured by the lodestar method. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016). That method calls for multiplying "the number of hours reasonably expended on the litigation . . . by a

reasonabl[e] hourly rate." *Ibid.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The party seeking attorney's fees bears the burden of proof on the number of hours expended and the rates claimed." *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999). If "documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433 (1983). Additionally, the Court must "exclude . . . hours that were not reasonably expended." *Id.* at 434. A reasonable rate for the purpose of the lodestar calculation is "the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Husted*, 831 F.3d at 715 (citing *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004)). Sources of information include "a party's submissions, awards in analogous cases, state bar association guidelines, and [the Court's] own knowledge and experience in handling similar fee requests." *Id.* at 716 (internal quotation omitted).

"When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "These two measures of the fairness of an attorney's award — work done and results achieved — can be in tension with each other." *Ibid.* "The lodestar method of calculating fees better accounts for the amount of work done, whereas the percentage of the fund method more accurately reflects the results achieved." *Ibid.* (citations and quotations omitted in this and following citations except as otherwise noted). "To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a reasonable hourly rate." *Ibid.* "The court may then, within limits, adjust the lodestar to reflect relevant considerations peculiar to the subject litigation." *Ibid.* "In contrast, to employ the

percentage of the fund method, the court determines a percentage of the settlement to award to class counsel." *Ibid.*

"As the two methods measure the fairness of the fee with respect to different desired outcomes, 'it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them.'" *Ibid.* (quoting *Rawlings*, 9 F.3d at 516). The Court also may elect to "employ[] the lodestar method to determine the fairness of the fee, then . . . cross-check it with the percentage-of-the-fund calculation." *Id.* at 280. However, regardless of the method chosen, the Court's decision must include "'a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at the fee' in order to allow effective appellate review for abuse of discretion." *Id.* at 279. "District courts have the discretion to select the particular method of calculation, but must articulate the 'reasons for adopting a particular methodology and the factors considered in arriving at the fee.'" *Id.* at 280 (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)).

"*Moulton* set out the germane factors," which include, "'(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.'" *Ibid.* (quoting 581 F.3d at 352). In a typical lodestar analysis, the Court may consider the scope of the fee request and whether any adjustments should be made in light of the so-called *Johnson* factors, which are congruent with the *Moulton* framework. Those factors include:

> "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other

employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Blanchard v. Bergeron*, 489 U.S. 87, 91 n.5, 93 (1989) (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).  However, there is a "strong presumption" that the lodestar represents the "reasonable" fee, and the party advocating a departure from the lodestar amount bears the burden of establishing that the adjustment is "necessary to the determination of a reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (holding that the lodestar figure has "become the guiding light of our fee-shifting jurisprudence") (citing *Blum v. Stenson*, 465 U.S. 886, 898 (1984)).

The parties ask the Court to authorize total compensation for attorney fees and costs incurred by class counsel in the amount of  $730,684.80, which consists of (1) $716,169.50 of attorney fees for class counsel, (2) $12,000 in fees for an independent actuarial analysis conducted by plaintiffs' retained actuary firm, Cavanaugh MacDonald Consulting, LLC, and $2,515.30 for the plaintiffs' portion of a mediator's fee payable to Kathleen Bogas, whose aid was instrumental in concluding the parties' negotiations.

In their motion, the parties represent that the proposed second amendment to the settlement agreement was submitted for Court approval after a years-long negotiation process that involved more than 100 meetings among counsel for both sides, an experienced mediator, and expert actuarial advisors retained by both sides.  The proposed modification concerned the reallocation of approximately $60,000,000 out of more than $570,000,000 in funds held by the two benefit trusts, which the parties felt was appropriate after they realized, with the benefit of thorough reviews by their expert economists, that both benefit funds had become overfunded far in excess

of the 130% retention level specified by the original settlement agreement.  The parties jointly proposed to use the excess funds to expand coverage to even more retirees, and to provide a $400 additional monthly pension stipend to most eligible retirees.

The retiree class was represented during the negotiations by three lawyers.  Peter Alter has more than 50 years of experience practicing in Michigan since 1972.  He submitted itemized billings for $51,100 in fees comprising 102.2 hours at a rate of $500 per hour, which he says is discounted from his usual billing rate in excess of $600 per hour.  John Bolton has 22 years of experience in the areas of commercial litigation and complex class actions.  He submitted itemized billings for $368,300 in fees comprised of 736.6 hours at a rate of $500 per hour, which he says is discounted from his usual billing rate in excess of $700 per hour.  Eric Ladasz has 22 years of experience mainly focused on complex commercial litigation.  He submitted billings for 465 hours at rates ranging from $385 up to $455 corresponding to his usual hourly billing rates, which increased during the years spanning the settlement negotiations.  Mr. Ladasz's total bill comes to $192,862.50, which corresponds to an average hourly rate for the hours recorded of approximately $414 per hour.  Mr. Bolton's and Mr. Ladasz's billing reports also included entries of $50,000 each which were denominated only as "placeholders for additional work"; however, those "placeholder" entries were not accompanied by any itemized billing records, and the joint motion has not been supplemented with any additional itemized invoices.  The "placeholder" entries totaling $100,000 are excluded from the following analysis.

Altogether, the itemized invoices submitted substantiate a total of $612,262.50 in billable lawyer hours.  The hourly rates here are above average, but fall comfortably within the higher end of the relevant market rate brackets.  According to the State Bar of Michigan's Economics of Law Survey (2023), which was submitted by the parties, the median hourly rate for lawyers with 16 to

25 years of experience was $315 per hour, with a 75th percentile rate of $425 per hour and a 95th percentile rate of $600 per hour.  The median hourly rate for lawyers with more than 35 years of experience was $300 per hour, with a 75th percentile rate of $400 per hour and a 95th percentile rate of $620 per hour.  Economics of Law Survey (2023), ECF No. 154-3, PageID.3362.  For general civil litigation, the surveyed median hourly rate was $325 per hour, with a 75th percentile rate of $425 per hour, and 95th percentile figure of $625 per hour.  *Id.* at 3363.  The hourly rates proposed here all fall within the 75th to 95th percentile brackets for counsel with similar experience.  Class counsel logged a total of 1,303 hours of attorney work on the case.  That total is significant, but in light of the titanic scope of the funds involved and the extensive actuarial work necessary to make the case that adjustments of the benefits funds could be undertaken without excessive economic risk for beneficiaries, the hours expended are justified.

The parties only advance a lodestar justification for the fee request here.  However, contextually it is notable that the $612,000 fee request represents barely 1.2% of the total excess funding of more than $51,000,000 for which the parties undertook to negotiate a reallocation, and merely 1/10th of one percent of the combined total of more than $570,000,000 under management in the combined benefit funds.  The primary benefit obtained under the settlement modification was an additional monthly stipend of $400 per class member, which works out to approximately $7,200,000 in additional benefits per year for the class of more than 1,500 retirees.  The attorney compensation sought here is only approximately 8.5% of the annual benefit increase obtained for retirees.  By any reckoning, those figures on a proportional basis are exceedingly modest in light of the scope of the funds in play and the benefit enhancement negotiated.

The plaintiffs submitted a supplemental brief advancing the position, which was mentioned in passing at oral argument, that the propriety of the fee request should be evaluated according to

Michigan state law, since the work here was performed under the auspices of a contract embodied in a settlement agreement. However, the plaintiffs concede in their supplement that the framework of analysis involves application of essentially the same factors under state law and under federal law as explicated in *Moulton*. "*Moulton* set out the germane factors," discussed above. *Gascho*, 822 F.3d at 279.

As indicated above, the value of the enhanced benefits obtained for retirees here is substantial by any measure, both on an individual monthly basis and on an aggregate annual basis for the entire retiree class, exceeding $7.2 million per year. The value of the services on an hourly basis was in line with the premium hourly rates charged, and the experience of counsel with many years in practice was necessary to resolve difficult questions presented by a shifting macroeconomic landscape confronting titanic public benefit funds. The representation was not undertaken on a contingent fee basis, but class counsel represent that they were not paid up front by the individual plaintiffs or CPREA due to the limited resources of the retiree association. The public has a significant interest in fairly compensating the work of able counsel for former public employees who expend their labor to secure more generous and equitable treatment of retired public servants whose lifetimes of service are crucial to efficient government. The issues presented involved difficult and complex legal and economic questions, which required expert analysis and hundreds of conferences over several years to resolve. Class counsel are devoted practitioners with experience in complex litigation ranging from 20 to more than 50 years, and their skill and acumen was essential to achieving a substantial benefit for the class.

As for the City of Pontiac's request for cost reimbursement, it asks for approximately $7,500 for providing class notice. Those expenses are *de minimis* in comparison with the scope of the benefit funds, which cover pension and healthcare benefits for more than 1,500 retirees,

holding more than $570,000,000 under management in the combined New GERS and New VEBA benefits trusts. Reimbursement of the expense for sending the class notice was authorized by the settlement amendment, which was approved by the Court after a fairness review.

The parties agreed in the second amended settlement agreement that the attorney's fees and costs awarded would be paid from the VEBA allocation before the final transfer of funds. Second Amendment of and Supplement to the Settlement Agreement Entered, ¶ 7, ECF 140-1, PageID.3006 (agreeing to the "payment of 'Reasonable Attorneys' Fees" . . . from the VEBA Allocation . . . prior to transfer of the Old GERS account funds to the New VEBA account"). The Court sees no reason not to honor that aspect of the agreement. The City requests that its reimbursement of $7,538.62 be paid from the Opt-Out Account. Absent objection, that funding source is appropriate.

III.

No objections to the fee request have been presented. However, the Court will approve only the total of $612,262.50 supported by the itemized billing records submitted, excluding the $100,000 in "placeholder" entries for unspecified "additional work." The Court will approve requested expenses in the amount of $12,000 in fees for plaintiffs' actuary firm, Cavanaugh MacDonald Consulting, LLC, and $2,515.30 in fees payable to Kathleen Bogas, mediator. The Court will approve the City's reimbursement request.

Accordingly, it is **ORDERED** that the joint motion for award of plaintiffs' attorney fees and costs (ECF No. 154) is **GRANTED IN PART**. Class Counsel is awarded attorney's fees and cost in the total amount of $626,777.80 to be paid from the VEBA Allocation of the Old GERS account funds.

-12-

It is further **ORDERED** that the City of Pontiac's motion for reimbursement of costs in the amount of $7,538.62 for providing class notice (ECF No. 157) is **GRANTED**. Those funds shall be paid from the Opt-Out Account.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: February 11, 2026